Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Nicholas A. West (SBN 324891) *nw@mckennonlawgroup.com*
**McKennon Law Group PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone:  949-387-9595  |  Fax:  949-385-5165

Attorneys for Plaintiff Warren Cooper

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WARREN COOPER,<br><br>               Plaintiff,<br><br>vs.<br><br>METROPOLITAN LIFE INSURANCE COMPANY; and DOES 1 to 10, inclusive,<br><br>               Defendants. | Case No.:  **'19 CV 2039 BEN AHG**<br><br>Action Filed:<br><br>Trial Date: |

**COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES**

[Filed Concurrently With:
- Civil Cover Sheet;
- Summons; and
- Certification of Interested Parties]

Case No.:



## JURISDICTION AND VENUE

1.     Plaintiff Warren Cooper ("Plaintiff") brings this action to recover benefits and to enforce and clarify his rights under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1132(a)(1)(B).  This Court has subject matter jurisdiction over Plaintiff's claim pursuant to ERISA Section 502(e) and (f), 29 U.S.C. Section 1132(e) and (f), and 28 U.S.C. Section 1331.

2.     Venue lies in the Southern District of California pursuant to ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), because Defendant Metropolitan Life Insurance Company ("MetLife") "resides" in this District.

## THE PARTIES

3.     Plaintiff is an individual who, at all times relevant to this action, was a citizen of the State of Florida and a resident of the city of Jacksonville, Duval County, Florida, but currently resides in Jamaica, New York.  Further, at all times relevant to this action, Plaintiff was a participant, as defined by ERISA Section 3(7), 29 U.S.C. Section 1002(7), in the employee welfare benefit plan (the "Plan") established by his former employer Citicards ("Citi"), which plan is at issue in this action.

4.     Defendant MetLife, which administers claims on behalf of Citi, at all times relevant administered long-term-disability ("LTD") benefits provided to Plan participants, including Plaintiff, by issuing group policy number 1137000-2-G to Citi.  That policy and the Plan promised to pay LTD benefits to Plaintiff should he

Case No.:



1   become disabled.  MetLife has acted as a claims administrator and as an ERISA

2   claims fiduciary of the Plan.

3

4       5.      The true names and capacities, whether individual, corporate, associate

5   or otherwise, of the defendants named herein as DOES 1 through 10, inclusive, are

6   unknown to Plaintiff at this time, who therefore sues DOES 1 through 10 by

7   fictitious names and will ask leave of the Court to amend this Complaint to show the

8   true names and capacities of DOES 1 through 10 when the same are ascertained.

9   DOES 1 through 10 are sued as principals and/or agents, servants, attorneys and/or

10  employees of said principals, and all the acts performed by them were within the

11  course and scope of their authority and/or employment.  Plaintiff is informed and

12  believes and thereupon alleges that each of DOES 1 through 10 is legally

13  responsible in some manner for the events referred to herein, and directly and

14  proximately caused the damages and injuries to Plaintiff as hereinafter alleged.

15

16                          **FACTUAL BACKGROUND**

17

18      6.      Citi hired Plaintiff on August 11, 2014.  Plaintiff worked for Citi as a

19  retention specialist.  A retention specialist resolves customers' problems in an

20  attempt to prevent customers from taking their business to other credit card

21  companies.  To perform his job duties, Plaintiff sat at a desk for eight hours per day,

22  speaking with angry customers on the phone and working at a computer.  The job

23  entailed a great deal of stress.  Citi demands that its retention specialists be

24  personable and pleasant.  They must be focused and able to quickly resolve

25  customer problems.  Citi requires that retention specialists address a high volume of

26  customer complaints.  Plaintiff's resume states that at Citi he used "Problem solving

27  and sales techniques to increase customer satisfaction; Resolve issues and objections

28

Case No.:



to retain long-term and new card members; Mitigate loss of card memberships by adding value toward increased card usage."

7.   Through his employment at Citi, Plaintiff participated in Citi's various employee benefit plans, including the Plan and its eligibility for LTD benefits.

8.   Under the Plan, "Disabled" or "Disability" means that:

due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and

1. During the Elimination Period, you are Totally Disabled;

"Totally Disabled" or "Total Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis, and during your Elimination Period, you are unable to perform your Own Occupation for any employer in your Local Economy.

2. after your Elimination Period and during the next 24 month period, you are unable to earn more than 80% of your Predisability Earning at your Own Occupation for any employer in your Local Economy;

Or

3. after the 24 months period, you are unable to earn more than 60% of your Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonable qualified taking into account your training, education, experience and Predisability Earnings.

9.   "Own Occupation" is defined as:

the activity that you regularly perform and that serves as your source of income. It is not limited to the specific position you held with your Employer. It may be a similar activity that could be performed with your Employer or any other employer.

-4-

Case No.:



10.     The Plan does not define "gainful occupation."

11.     In early 2017, Plaintiff started developing diabetic neuropathy.[1]  He started experiencing pain in his feet.  Given that he worked at a large facility, this made Plaintiff's job more difficult.  A walk to a different part of the facility could easily take 10 to 15 minutes.  Over time, his diabetic neuropathy progressed such that he experienced pain even when sitting at his desk.

12.     Even though he experienced pain in his feet, Plaintiff continued to excel at his job duties, including winning several awards based on his quality of work.

13.     Plaintiff's medical problems became more severe when, on May 25, 2017, he experienced sudden heart failure.  In particular, he suffered from systolic heart failure.[2]  He was admitted to Memorial Hospital in Jacksonville, Florida.  Doctors performed an echocardiogram.  The echocardiogram indicated that Plaintiff had a mildly dilated left ventricle with moderately reduced systolic function.  He had a moderately dilated left atrium and mildly dilated right ventricle.  The



---

[1] Diabetic neuropathy is a form of nerve damage that affects some diabetics.  A high blood-sugar level can cause nerve damage.  This damage most often occurs in the feet and hands.  *See* Mayo Clinic Staff, *Diabetic Neuropathy*, Mayo Clinic (August 12, 2019, 10:20 AM), *https://www.mayoclinic.org/diseases-conditions/diabetic-neuropathy/symptoms-causes/syc-20371580.*

[2] Systolic heart failure is when the left ventricle of the heart has weakened.  The left ventricle pumps most of a person's blood. With this condition, the blood is not adequately pushed throughout the body.  This lack of blood flow can be caused by congestion in the arteries and veins or through a weakening of the heart muscle.  WebMD, *What is Systolic Heart Failure?*, WebMD (August 13, 2019, 10:55 AM), *https://www.webmd.com/heart-disease/heart-failure/what-is-systolic-heart-failure#1.*

Footnote continues on next page…

Case No.:

1    echocardiogram further revealed that Plaintiff had an ejection fraction[3] ("EF") of

2    30%.[4]

3

4        14.    On May 27, 2017, Plaintiff underwent a stress test.  The stress test

5    revealed that Plaintiff suffered from a moderate-sized fixed inferior defect and a

6    dilated left ventricle with severe systolic dysfunction.  Plaintiff's symptoms

7    included fatigue, palpitations, dizziness and shortness of breath.  The report of the

8    results labeled the test results as "abnormal."  His EF was 20%.

9

10       15.    Doctors discharged Plaintiff from the hospital on May 29, 2017.  Due

11   to his fragile health, Plaintiff wore a Life Vest.[5]  Plaintiff complied with his doctors'

12   instructions and only removed the Life Vest when bathing.

13

14

15

16   _____

[3] "Ejection fraction . . . is a measurement, expressed as a percentage, of how much
blood the left ventricle pumps out with each contraction. An ejection fraction of 60
percent means that 60 percent of the total amount of blood in the left ventricle is
pushed out with each heartbeat.  This indication of how well [a] heart is pumping
out blood can help to diagnose and track heart failure."  American Heart
Association, *Ejection Fraction Heart Failure Measurement*, American Heart
Association (August 12, 2019, 10:20 AM), *https://www.heart.org/en/health-
topics/heart-failure/diagnosing-heart-failure/ejection-fraction-heart-failure-
measurement*.

[4] "An EF from 41 to 49 percent may be considered 'borderline' " for serious heart
problems.  American Heart Association, *Ejection Fraction Heart Failure
Measurement*, American Heart Association (August 12, 2019, 10:20 AM),
*https://www.heart.org/en/health-topics/heart-failure/diagnosing-heart-failure/
ejection-fraction-heart-failure-measurement*.

[5] A Life Vest is a personal defibrillator worn by individuals suffering from severe
heart problems.  The Life Vest continuously monitors the wearer's heart.  If
necessary, the Life Vest administers a shock treatment to restore normal heart
rhythms.

Footnote continues on next page…

Case No.:

16.     Ramon Castello, M.D., a cardiologist, and Erin Vaughan, A.R.N.P., at CardioHealth, started treating Plaintiff.  Plaintiff's June 5, 2017 medical records from CardioHealth list his diagnoses as "Essential (primary) hypertension[,] Hypertensive disorder[,] Mixed hyperlipidemia[6][,] . . . Acute systolic (congestive) heart failure[,] Acute systolic heart failure[,] Shortness of breath[,] Dyspnea[7][,] Type 2 diabetes mellitus without complications [and] Diabetes mellitus."  His June 19, 2017 medical records from CardioHealth also reference how he suffered from diabetic neuropathy.  The records state that his "feet burn, sting and cramp at night[.]"  Plaintiff's medications then included Coreg 12.5mg (for the treatment of high blood pressure), naproxen 500mg (for pain management), aspirin 81mg, atorvastatin 40mg (for the treatment of high cholesterol and triglyceride levels), lisinopril 2.5mg (for the treatment of high blood pressure and heart failure, with the potential for reduction in the risk of death shortly after a heart attack), metformin 500mg (for treatment of diabetes) and spironolactone 25mg (for the treatment of blood pressure and fluid retention).

17.     On June 21, 2017, Dr. Castello completed a "Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)" (the "First Certification").  In the First Certification, Dr. Castello explained that the "Probable duration of condition" was "indefinable/undeterminable."  Dr.

_____

[6] "Mixed hyperlipidemia is a genetic disorder passed down through family members . . . it means [that a person has] higher-than-normal levels of cholesterol, triglycerides, and other lipids in [their] blood. The disorder contributes to heart disease and early heart attacks. Diabetes, hypothyroidism, obesity, and alcohol abuse can make the condition worse." Graham Rogers, M.D. and Marjorie Hecht, *Mixed Hyperlipidemia*, Healthline (August 13, 2019, 10:55 AM), *https://www.healthline.com/health/mixed-hyperlipidemia.*
[7] Dyspnea is shortness of breath.  This is often caused by various health problems, such as damage to the heart.  WebMD, *What is Shortness of Breath (Dyspnea)?*, WebMD (August 13, 2019, 10:55 AM), *https://www.webmd.com/lung/shortness-breath-dyspnea#1.*

Case No.:



Castello marked "no" to a question asking "Is the employee unable to perform any of his/her job functions due to the condition?"  However, he marked that Plaintiff would work on a reduced schedule due to the condition.  He explained that Plaintiff would need to miss work on a regular basis due to flare ups of his condition, up to four days a week.  Dr. Castello also noted that Plaintiff suffered from systolic heart failure, shortness of breath and fatigue.

18.     On June 23, 2017, Luis F. Anez, M.D., Plaintiff's primary care provider, completed a "Certification of Health Care Provider for Employee's Serious Health Condition (Family and Medical Leave Act)" (the "Second Certification").  In the Second Certification, Dr. Anez explained that "pt unable to go into work due to pain and SOB."  Dr. Anez also noted that Plaintiff suffered from "diabetic neuropathy (foot pains)" and that due to chest pains, shortness of breath and "very fatigue," Plaintiff could not return to work.  Dr. Anez explained that Plaintiff experienced day-long flare ups of those symptoms on a regular basis, four to five times per week.  Under Part A of the form, Dr. Anez marked the "Probable duration of condition" as "Lifetime."

19.     In a letter dated June 28, 2017, MetLife approved Plaintiff's claim for short-term-disability ("STD") benefits agreeing that he was totally disabled.  MetLife extended the STD benefits in a subsequent letter dated July 14, 2017.

20.     On June 28, 2017, Plaintiff underwent an echocardiogram.  The "Echocardiogram Patient Report" stated that Plaintiff suffered from:

Left Ventricle: Mild left ventricular enlargement Abnormal systolic function with regional wall motion abnormalities.  Severe global hypokinesis.  The calculated left ventricular ejection fraction is



28.54%.  Biplane 22.5%.  Eccentric left ventricular hypertrophy.  RTW 0.37.

Diastolic Function:  There is mildly abnormal diastolic function with increased LV end-diastolic pressure.  Grade 1A.  The calculated PCWP is 24 mmHg.

. . .

Tricuspid Valve:  There is mild tricuspid valve regurgitation.  Normal estimated right ventricular systolic pressure of 30 mmHg.

21.     On July 5, 2017, Plaintiff treated with CardioHealth.  There, he reported suffering from "chest pressure occasionally lasting hours, resting makes it better.  Pt complains of shortness of breath on exertion.  Pt complains of palpitations.  Pt complains of some dizziness.  Pt complains of pain on feet."

22.     On July 21, 2017, Plaintiff applied for LTD benefits.  His various health problems still left him unable to return to work.  The application asks, "Please provide us with a brief description of your present condition(s).  Describe any physical and/or psychiatric/psychological limitations related to your return to work."  Plaintiff responded, "Shortness of breath, palpitations, fear of having a heart attack and diabetic neuropathy in both feet prior to heart condition."

23.     In a July 27, 2017 internal notation, a MetLife LTD claims specialist, Katie Barry, noted "**EE has subsedentary work capacity** as he continues to be symptomatic with palpitations, dizziness and sob with exertion."  (Emphasis added.)  She also noted that "EE has multiple comorbidities and is of advanced age which can impact overall recovery and prognosis."

24.     July 31, 2017 medical records from CardioHealth document that Plaintiff suffered from "shortness of breath of exertion."  He also continued to suffer from systolic heart failure and diabetic neuropathy.

Case No.:



25.     MetLife approved Plaintiff's LTD benefits on August 1, 2017.  MetLife informed Plaintiff that he potentially qualified for Social Security Disability Insurance ("SSDI") benefits and arranged for the Advocator Group ("AG") to represent Plaintiff during the SSDI benefits application process.

26.     An August 15, 2017 echocardiogram of Plaintiff listed the following findings:

> Left Ventricle: Normal left ventricular dimension.  Moderately reduced left ventricular systolic function.  Global hypokinesis.  The calculated left ventricular ejection fraction is 33.36%.  Biplane 36.8%.  Improved from 28.5%.  Abnormal Left ventricular geometry with concentric remodeling.  RWT 0.45.
>
> Diastolic Function: There is mildly abnormal diastolic function with increased LV end-diastolic pressure.  Grade 1A.  The calculated PCWP is 17 mmHg.  Previous echo PCWP 24 mmHg.
>
> Tricuspid Valve: There is mild iricuspid valve regurgitation.  Normal Estimated Right ventricular systolic pressure of 23 mmHg.

27.     Plaintiff's medical records from August 22, 2017 and September 5, 2017 treatments at CardioHealth document that Plaintiff still suffered from systolic heart failure, shortness of breath and diabetic neuropathy.

28.     A September 19, 2017 "Echocardiogram Patient Report" states that Plaintiff had "mildly abnormal diastolic function. Grade 1."  It also states that Plaintiff suffered from an "Abnormal Left ventricular geometry with concentric remodeling."  As for its findings, the report states:

> Left Ventricle: Normal left ventricular dimension. Mildly reduced left ventricular systolic function. The calculated left ventricular ejection fraction



is 50.8%. Biplane 49.0%. Improved tram 33.4%. Abnormal left ventricular geometry with concentric remodeling. RWT 0.44.

Diastolic Function: There is mildly abnormal diastolic function. Grade I. The calculated PCWP is 11 mmHg. Previous echo PCWP 17 mmHg.

Tricuspid Valve: There is physiologic tricuspid valve regurgitation. Normal estimated right ventricular systolic pressure.

29.     On October 6, 2017, Dr. Anez prescribed gabapentin in an attempt to alleviate Plaintiff's foot pain. Plaintiff took 100mg doses of gabapentin three times per day. Gabapentin provided "mild relief."

30.     In the records of a November 10, 2017 visit with Dr. Anez, the doctor noted that Plaintiff's EF was 50%. Plaintiff's other health problems had not improved. Dr. Anez diagnosed Plaintiff with "Neuropathy[,] Diabetes[,] and Cholesterolemia[.]" Dr. Anez listed Plaintiff's ongoing treatment as:

1) Peripheral neuropathy
-Hx of peripheral neuropathy, starting a little over a year ago. Walking even short distances is painful.
-Started on Gabapentin 100 mg TID at last visit, states it is providing some relief with no issues so will follow
-Vitamin B12 and HbA1C checked and WNLs

2) CHF

-Hx of CHF with acute exacerbation EF of 20%. Seen in hospital and returned to 50% afterwards
-Patient currently following with Cardiology
-Medications working well at this time, will continue to follow.

31.     At that time, Plaintiff's medications consisted of: Aldactone 25mg (for the treatment of high blood pressure and fluid retention), Entresto 49mg (for heart



failure), aspirin 81mg, carvedilol 25mg (for high blood pressure, heart failure and risk of death shortly after a heart attack), metformin 500mg, tadalafil 5mg (for high blood pressure in the lungs and for enlarged prostrate), tizanidine 4mg per eight hours (for muscle spasms) and warfarin 5mg (for the treatment and prevention of blood clots).

32.    In December 2017, Plaintiff's right shoulder started to cause him significant pain.

33.    In a MetLife note dated February 2, 2018, MetLife's own internal records acknowledged that Plaintiff still suffered from the "significant co-morbidity" of his diabetic neuropathy and heart condition.

34.    In February 2018, Susan N. Michaud, a nurse practitioner for MetLife, attempted to contact Plaintiff's treating physicians.  She left voice messages with both Dr. Anez and Dr. Castello.  She never spoke with either doctor.  Whereas her notes are far from clear and provide little explanation as to her reasoning, Ms. Michaud concluded that Plaintiff had sedentary work capacity.  This conclusion appears to rely on little more than Plaintiff's then EF.  She requested that a medical director examine Plaintiff's file.

35.    In February 2018, MetLife instructed T.C. Barber, D.O., to perform a "paper review" of Plaintiff's medical records.  Dr. Barber is a MetLife employee, a medical director.

36.    In a 2-page report, Dr. Barber determined that Plaintiff could return to work.  His report made no mention of Plaintiff's "significant co-morbidity." Instead, he emphasized that (1) Plaintiff had ceased using the Life Vest, (2) that his

Case No.:



EF was 50% and (3) that there "was no evidence of an impairment resulting from" Plaintiff's other conditions.  Though the flaws in Dr. Barber's report are addressed in detail below, it is worth noting that he ignored all reports of Plaintiff's shortness of breath.  He inaccurately stated that Plaintiff had relief from his neuropathy because of his gabapentin when, in fact, Plaintiff only received "mild relief" from gabapentin.  Plaintiff still suffered from severe foot pain.  MetLife faxed Dr. Barber's report to both Dr. Anez and Dr. Castello for comment.

37.     Ms. Vaughan, an assistant to Dr. Castello, responded to Dr. Barber's report in a letter dated February 20, 2018.  Ms. Vaughan explained that:

> Mr. Warren Cooper (claim number 751707111669) is a patient in our cardiology practice since 5/2017.  He has systolic and diastolic heart failure/HFrEF.  He is limited in his daily activities, as he is a New York Heart Association Class II-III.[8]

MetLife conducted no follow up to get clarification or confirmation of Plaintiff's disability status.

38.     Plaintiff went to the emergency room on February 22, 2018 due to shoulder pain and reduced mobility in his right arm.

---

[8] A New York Heart Association Class II is defined as:
    Slight limitation of physical activity. Comfortable at rest. Ordinary physical activity results in fatigue, palpitation, dyspnea (shortness of breath).
A New York Heart Association Class III is defined as:
    Marked limitation of physical activity. Comfortable at rest. **Less than ordinary activity causes fatigue, palpitation, or dyspnea.**

American Heart Association, *Classes of Heart Failure*, American Heart Association (August 12, 2019, 10:38 AM), (Emphasis added), *https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure*.

Case No.:

39.     MetLife terminated Plaintiff's LTD benefits via a letter dated February 26, 2018 (the "Denial Letter").  The Denial Letter states:

> Your claim was reviewed by both a Metlife Nurse Clinician and Metlife Medical Director.  In an effort to provide you with a full and fair review of your claim, we forwarded the completed review to both Dr. Anez and Dr. Castello and requested that the healthcare providers submit any comments that they may have had regarding the Metlife clinical report.  They were given the opportunity to provide additional clinical information in support of your disability and the severity of your symptoms, if they did not agree with the final review.  There was no response to this request.  Therefore your claim has been terminated.

40.     Though the flaws in the Denial Letter are addressed in detail below, it is worth noting that the Denial Letter completely ignores that MetLife in fact received a response from Dr. Castello's office.  The February 20, 2018 letter explained that Plaintiff suffered from a condition which results in fatigue and shortness of breath from "less than ordinary activity[.]"

41.     Plaintiff experienced increasing difficulty in treating his conditions due to having lost his only source of income: his disability benefits.  He still could not return to work.  He could no longer afford insurance.  When he could afford treatment, however, he continued to see doctors in an effort to improve his condition.

42.     Plaintiff treated with Dr. Anez on March 15, 2018.  As documented in the medical records from that visit, the pain in Plaintiff's feet had continued to worsen.  The gabapentin now did not provide the limited relief it had once provided. Dr. Anez prescribed a daily dosage of 900mg of gabapentin.  This prescription tripled Plaintiff's dosage of gabapentin in an attempt to control his diabetic neuropathy.  Dr. Anez also noted Plaintiff's increasing pain in his shoulder and



1  limited range of motion in his right arm.  Dr. Anez recommended that Plaintiff

2  accept a referral to a podiatrist.  Plaintiff declined due to financial problems.

3  Plaintiff's diabetic neuropathy continued to cause him significant pain and impede

4  his mobility.  His medical records further noted that Plaintiff "Complains of

5  shortness of breath on exertion and palpitations.  Having difficulty with 5mins of

6  walking at grocery store.  States he has to sit for 30 or more minutes.  Denies chest

7  pain.  Reports increasing neuropathy."

8

9      43.    On March 21, 2018, Plaintiff submitted an initial handwritten appeal.

10  In the handwritten appeal, Plaintiff explained that his condition had not improved.

11  His condition still prevented him from returning to work.  He had not seen his

12  treating physicians as regularly as he would have liked because of financial troubles.

13  He explained to MetLife that, in addition to his other ailments, he had developed a

14  shoulder condition sufficiently severe that it had compelled him to seek treatment at

15  an emergency room.  He also explained that his previously prescribed dosage of

16  medication for his diabetic neuropathy was no longer providing him with relief.  His

17  condition was "affecting walking, sitting and standing [which] remains unimproved

18  or is worsening."

19

20      44.    On April 4, 2018, Plaintiff underwent an echocardiogram.  The

21  echocardiogram report lists an "abnormal left ventricular geometry with concentric

22  remodeling. RWT 0.46" and a "mildly abnormal diastolic function. Grade I."

23

24      45.    Plaintiff's records from an April 5, 2018 visit to CardioHealth note that

25  Plaintiff continued to suffer from shortness of breath from minor physical activity.

26  A "Stress Echo Report" from the same date documents an echocardiogram

27  examination in which Plaintiff jogged on a treadmill.  In that data summary, it

28  shows that Plaintiff could only last two-and-one-half minutes on a treadmill before

Case No.:



needing to stop.  His reason for stopping was "General fatigue, Neuropathy bilateral feet."  After only two-and-one-half minutes on his feet, Plaintiff's bilateral neuropathy had caused him significant-enough pain that he could not complete the treadmill echocardiogram examination.  The report further stated that "Resting LVEF was 60%.  Peak LVEF 70%."  It further noted that his heart rate was only 70% of the expected rate for someone of Plaintiff's age.

46.     Medical records from an April 9, 2018 visit with Dr. Anez show that Plaintiff's right shoulder pain and bilateral feet pain had increased and that Plaintiff could not "lift right arm above shoulder level."  Plaintiff's diabetic neuropathy was stable.  The increased dosage of gabapentin had merely stabilized Plaintiff's diabetic neuropathy.  His condition had not improved.

47.     On May 18, 2018, Christa L. Catalano, M.D., at San Jose Imaging, performed an MRI of Plaintiff's shoulder.  The MRI report listed the following impressions:

Impressions: 1) Decreased subacromial space is noted in moderate impingement is seen at the AC Joint; 2) a partial tear of the supraspinatus tendon is noted; 3) tenosynovitis of the subcapularis tendon is seen; 4) a small joint effusion is present.

48.     On July 3, 2018, Plaintiff saw an orthopedic surgeon, Michael C. Freidl, M.D.  Dr. Freidl noted that Plaintiff suffered from "impingement syndrome of right shoulder and partial nontraumatic rupture of right rotator cuff."

49.     Plaintiff treated at CardioHealth on July 11, 2018.  The report of his visit lists his diagnoses as: "Essential (primary) hypertension, hypertensive disorder, mixed hyperlipidemia . . . acute systolic (congestive) heart failure, acute systolic





heart failure, shortness of breath, dyspnea, type 2 diabetes mellitus without complications, diabetes mellitus, heart failure unspecified, heart failure with reduced ejection fraction, intracardiac thrombosis not elsewhere classified [and] thrombosis." Those records list his ongoing problems as "Dizziness and giddiness, Mixed hyperlipidemia, Other fatigue, Palpitations, Shortness of breath, Type 2 diabetes mellitus without complications, Intracardiac thrombosis, not elsewhere classified[.]" Whereas Plaintiff's medical records show that his EF was slowly improving, he still suffered from "shortness of breath on exertion." His records also show his ongoing shoulder problems of "Right rotator cuff rupture with frozen shoulder . . . [Plaintiff] [i]s also having similar symptoms in left shoulder."

50.     On August 24, 2018, Plaintiff, through his counsel, appealed the denial of his benefits. With his appeal letter, Plaintiff, among other things, submitted updated medical records, an August 23, 2018 letter by Dr. Anez and Plaintiff's own personal statement.

51.     In addition to the above documentary support in favor of his disability, Plaintiff raised various legal concerns with MetLife's denial. Plaintiff argued that MetLife had relied "on the opinion of an unqualified physician who failed to examine Plaintiff, failed to speak to his treating physicians and failed to give proper weight to their conclusions" and that "MetLife failed to properly consider the combined effects of Plaintiff's numerous conditions and medications."

52.     Plaintiff argued that MetLife's in-house physician had mischaracterized the medical evidence and failed to even address Plaintiff's shoulder. MetLife's in-house physician stated:

> While Mr. Cooper's reported symptoms are noted and appreciated, in
> my opinion the medical information failed to document a condition of a

severity to preclude work.  It was appreciated Mr. Cooper had had a significantly reduced ejection fraction in May 2017 however it was noted to have improved to 50% on 9/19/2017 as noted above.  Also there was no evidence of moderate to severe valvular heart disease or evidence of critical atherosclerotic disease that would impact Mr. Cooper's work capacity as it pertains to a cardiac condition.  It was also appreciated his Life Vest was discontinued on 9/25/2017 and he was cleared to be able to travel out of the country.

It was also appreciated Mr. Cooper was diagnosed with peripheral neuropathy however he had had relief with gabapentin on 11/10/2017.  Also, there were a number of other medical conditions listed above, but there was no evidence of an impairment resulting from those conditions.  Updated medical information will gladly be reviewed for reconsideration if made available.

53.     Plaintiff's own treating physician, Dr. Anez, responded to this report and clearly explained to MetLife that the in-house physician's opinion is incorrect. Dr. Anez explained in his August 23, 2018 letter that:

Dr. Barber's report correctly notes that Mr. Cooper has an ejection fraction of 50%.  However, it mischaracterizes the significance of that result.  When engaged in remotely strenuous activity, Mr. Cooper still suffers from shortness of breath.  He must stop to rest when performing even basic activities.

[. . .]

I reviewed Dr. Barber's report in which he states that Gabapentin has provided Mr. Cooper with relief from his diabetic neuropathy.  This statement is inaccurate and mischaracterizes Mr. Cooper's condition. In fact, since reporting some mild initial relief under Gabapentin, I have had to increase his dosage from 100mg, three times a day, to 300mg, three times a day.  Mr. Cooper's diabetic neuropathy still causes him significant pain in his feet.

54.     Dr. Anez further stated that:

-18-



Today, I examined Mr. Cooper. He still suffers from severe diabetic neuropathy and pain in his shoulder. He still suffers from shortness of breath when performing mildly strenuous activity. **His condition has not improved.**

Based on my years of treatment and examination of Mr. Cooper, it is my strong opinion that he does not have the functional capacity Dr. Barber believes is within his ability. Indeed, I fail to understand the basis for Dr. Barber's conclusions given the information contained in my records and Dr. Castello's records. I understand that Mr. Cooper's job entailed him spending his day speaking to angry customers on the phone while sitting and performing computer work. However, it is my opinion that **Mr. Cooper continues to be unable to return to even sedentary work due to his pain, fatigue and other symptoms and conditions**, and Dr. Barber's conclusions are not supported by any credible medical evidence.

Mr. Cooper is disabled and unable to perform the material and substantial duties of his occupation due to his medical conditions. Unfortunately, even with regular examinations and a faithful following of this medication regimen, I do not believe that he will be able to return to work in the foreseeable future. (Emphasis in original).

55.     As Dr. Anez explained, a simple examination of Plaintiff's medical records reveals that MetLife and its physician completely and biasedly mischaracterized Plaintiff's relief achieved by taking gabapentin. Those records reveal that Plaintiff only experienced "mild relief." He still suffers from severe diabetic neuropathy. Dr. Anez reported on November 10, 2017 that "[Plaintiff] has complaints of leg pain for which he is taking Gabapentin 100 mg **with mild relief**." (Emphasis added.). MetLife's in-house physician blatantly mischaracterized Plaintiff's medical records.

56.     A further discrepancy on MetLife's part is that its in-house physician refused to acknowledge the note from Dr. Castello's office. As previously explained, that note states that Plaintiff "has systolic and diastolic heart

Case No.:



failure/HFrEF. He is limited in his daily activities, as he is a New York Heart Association Class II-III."

57.     Plaintiff further questioned MetLife's reliance on a doctor who is working outside of his area of expertise. Plaintiff's condition involves cardiology, neurology, orthopedics and endocrinology. MetLife's in-house physician did not appear to have experience or training in any of those areas. This is in violation of ERISA regulations that outline the requirements for a full and fair review of a participant's claim on appeal and provide that "the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3)(iii); § 2650.503-1(h)(4). The Eighth Circuit has noted that "the administrator's use of an in-house physician rather than a specialist to review a disability claim involving an uncommon disease can be a serious procedural irregularity affecting the administrator's decision." *Morgan v. UNUM Life Ins. Co. of Am.*, 346 F.3d 1173, 1177 (8th Cir. 2003). In *Morgan*, the court found that the insurer's decision to deny benefits was not supported by substantial evidence, in part because "[n]othing in the record show[ed] that [the insurer's in-house physician] had any expertise or experience whatsoever in dealing with [the claimant's disease]." *Id*. at 1177-78.

58.     Plaintiff further drew attention to how MetLife's in-house physician did not explain why he disagreed with Plaintiff's treating physicians. The denial letter states that attempts were made to contact the treating physicians, but that the treating physicians never responded. This does not address how, in fact, MetLife had the opinions of both Dr. Castello and Dr. Anez, as memorialized in a letter to MetLife by Dr. Castello's assistant and the forms each doctor completed documenting Plaintiff's disability. No attempt was made to address those opinions. MetLife

-20-

Case No.:



simply ignored the evidence that did not support its conclusion.  It was improper for MetLife to completely disregard those opinions.

59.     Plaintiff also argued that MetLife had failed to require Plaintiff to submit to a physical examination, even though the plan required him to do so. MetLife's in-house physician conducted only a paper review of Plaintiff's condition and made a recommendation to deny Plaintiff's claim.

60.     Plaintiff further argued that MetLife had failed to consider the combined effects and significance of his numerous medications.  Courts throughout the country have held that an insurer must consider all symptoms, conditions and effects of medications holistically, not in isolation.  *See Maiden v. Aetna Life Ins. Co.*, 2016 WL 81489, at *7 (N.D. Ind. Jan. 6, 2016); *Hertan v. Unum Life Ins. Co. of Am.*, 111 F.Supp.3d 1075, 1086-87 (C.D. Cal. 2015); *Godmar v. Hewlett-Packard Co.*, 631 F.App'x 397, 405, 407 (6th Cir. 2015); *Kirkpatrick v. Liberty Mut. Grp., Inc.*, 856 F.Supp.2d 977, 998–99, 1000 (S.D. Ind. 2012).

61.     Courts have also held that a doctor's prescription of various powerful medications is strong objective evidence of disability.  *See Flanigan v. Liberty Life Assur. Co. of Bos.*, 277 F.Supp.2d 840, 844 (S. D. Ohio 2003); *Wasson v. Media Gen., Inc.*, 446 F.Supp.2d 579, 586 (E. D. Va. 2006); *Stamm v. Provident Life & Acc. Ins. Co.*, 1998 WL 596700, at *11 (N.D. Ill. Sept. 2, 1998).

62.     Finally, in his personal statement, Plaintiff explained his condition:

Between May to December 2016, my diabetic neuropathy started to become severe . . . .  I experience foot pain constantly.  At times, the pain even wakes me from my sleep.  The pain is more severe when I walk.  Any trip to buy groceries must be completed within 15 to 20 minutes.  I limit myself to smaller stores so that I can minimize my walking . . . .





In May 2017, I was hospitalized for systolic heart failure.  Whereas my ejection fraction rate is now 50%, I still suffer the consequences of my heart problems.  If I overexert myself, I may suffer from a "flare up" of my heart condition.  I will experience shortness of breath and will need to rest.  It also takes me longer to recover than a normal person.  This requires that I live a guarded life in order to avoid exacerbating my heart condition.

I also suffer from pain in my shoulder.  My shoulder pains became noticeable around early December 2017.  It has now been diagnosed as a rotator cuff tear with fluid and is completely debilitating at this time . . . .  My right arm and shoulder pains have been worsening by expanding from my right shoulder down to my elbow . . . .   Due to favoring my right shoulder, I am now showing symptoms in my left shoulder.

63.     Plaintiff also explained that:

If I were to return to Citi Retentions, I would be unable to meet the stressful demands of my former duties.  It would result in me being cited for insufficient performance in call volume, length of calls, number of breaks and length of breaks due to neuropathy flare ups.  Also, my difficulties using my arm means that I would likely have trouble documenting calls or using a keyboard effectively.  Even drafting this statement for my appeal has been taxing.  I most certainly could not reach my previous, award winning, degree of competence.  Even basic competence at my former job is unobtainable . . . .

At the present time, under the debilitating effects of my diabetic nerve pain in both feet, in addition to the severe pain and restricted movement in my right shoulder, I am unable to perform any duties in the Retention unit requiring use of my arms with any frequency, such as computer work.  I am also incapable of walking the significant distance required to traverse the Citi parking facilities, walking to and from the restrooms and walking to and from the break rooms. The Citi campus in Jacksonville, Florida is quite large.  Walking long distances is required to perform almost any function.  I am also unable to function at the pace required by my previous job.  I would require more frequent breaks and increased hold times between calls to recover my normal breathing levels to take the next call.  Furthermore, with ever increasingly severe neuropathic pain affecting my feet, it would become more difficult to withstand the pressures of cordially,

Case No.:



respectfully and effectively handling calls and volumes at any acceptable levels while remaining consistent in production and call quality.

64.    MetLife submitted Plaintiff's medical records to Ifeanyi Nwaneshiudu who specializes in occupational medicine.  Dr. Nwaneshiudu produced an essentially worthless four-page report dated September 12, 2018.  Dr. Nwaneshiudu stated that Plaintiff showed signs of functional impairment from his right shoulder.  However, he claimed there was no physical impairment from Plaintiff's diabetic neuropathy or heart condition.  Dr. Nwaneshiudu claimed that Plaintiff could work under the following conditions:

> Constant sitting without restrictions in an 8-hour day.
> Constant walking without restrictions in an 8-hour day.
> Constant standing without restrictions in an 8-hour day.
> Constant reaching at the waist level, and kneeling.
> Occasional lifting, carrying, pushing and pulling up to 20 pounds.
> Constant handling, fingering, feeling, gripping, grasping, pinching, fine and gross motor use of hands.
> Occasional climbing, stopping, balancing, driving, reaching above the head, reaching below the waist and bending at waist level.
> The claimant should be able to work at the above restrictions for 8 hours per day, 40 hours per week.

65.    Of note is the conclusory nature of the report.  In a report that consisted of four brief pages, two pages consisted mainly of a header and a list of documents received.  One-half of a page consisted of a signature block and a list of questions to Plaintiff's treating physicians.  As for the remaining two pages, the report contained little meaningful analysis but, rather, consisted of entirely conclusory, factually inaccurate statements.

66.    For example, Dr. Nwaneshiudu states, "I do not find evidence of significant cardiac impairment in review of the provided records, and there were no



physical impairments noted with regards to his diagnosis of diabetic neuropathy." Among the provided records was Dr. Anez's August 23, 2018 letter. In that letter, Dr. Anez explained that "While engaged in remotely strenuous activity, Mr. Cooper still suffers from shortness of breath due to his heart condition. He must stop to rest when performing even basic activities." Dr. Anez further stated that "Mr. Cooper's diabetic neuropathy still causes him significant pain." Dr. Nwaneshiudu completely disregards the August 23, 2018 letter.

67.    Of note, Dr. Nwaneshiudu's report includes a list of documents he reviewed while preparing his report. Nowhere on that list does it include the April 5, 2018 Stress Echo Report. The April 5, 2018 Stress Echo Report documents an echocardiogram examination in which Plaintiff jogged on a treadmill. In that data summary, it shows that Plaintiff could only last two-and-one-half minutes on a treadmill before needing to stop. His reason for stopping was "General fatigue, Neuropathy bilateral feet." After only two-and-one-half minutes on his feet, Plaintiff's bilateral neuropathy had caused him significant-enough pain that he could not complete the treadmill echocardiogram examination. It provides objective evidence of his condition. Either Dr. Nwaneshiudu ignored the report, or he never even received it. If MetLife failed to provide the medical records to Dr. Nwaneshiudu, then MetLife abused its discretion by hiding important evidence of Plaintiff's condition from its reviewing physician. If Dr. Nwaneshiudu simply ignored the report, then that was improper and MetLife abused its discretion in relying on his report.

68.    Dr. Nwaneshiudu had questions for Plaintiff's primary care providers, Dr. Anez and Dr. Castello. Dr. Nwaneshiudu asked:

1. What is the claimant's current functional status and is it based on clinical findings on physical examination or the claimant's clinical



complaints?  Please state the specific physical functional deficits (strength, range of motion etc.).

2. What is the plan for the claimant's orthopedic specialist regarding his right shoulder?

3. Has the claimant had a recent independent medical evaluation from both a physical and cardiac perspective?

4. What is the claimant's prognosis for improvement if any?

69.     On September 18, 2018, MetLife faxed Dr. Anez and Dr. Castello copies of Dr. Nwaneshiudu's report and questions.  MetLife demanded that the doctors respond to the letter within ten days.

70.     Dr. Castello was out of the country when MetLife faxed the report and questions.

71.     On September 28, 2018, Dr. Anez responded to Dr. Nwaneshiudu's questions.  With respect to the first question, Dr. Anez explained that:

the [patient] claims to be disable[d], because DM neuropathy and rotator cuff on the R side, he has not being able persue [sic] an orthopedic Dr for his shoulder, the pat has MRI on May 18th, 2018 at San Jose imaging showing a tear.

72.     With respect to the second question, Dr. Anez stated that:

The MRI shows decrease[d] subacromial space in moderate impingement in the AC joint R shoulder.  A partial tear of the supraspinatus tendon.  Tenosynovitis of the subscapular tendon.  A small joint effusion was seen all this done, already San Joe [sic] imaging a have a copy of the report. The plan is to see orthopedic orthopedist I am a Family practioner [sic] (Dr. Luis F. Anez). The pt saw Dr. Freidel at UF Sands you must obtain a copy of his evaluation, on July 3rd 2018.  He arranged [sic] for PT and injection not done.

Case No.:



73.   With respect to the fourth[9] question, Dr. Anez stated that:

Cardiac prospective [sic], he is euvolemic., he has seen his cardiologist in the past.  The pt is taking coumadin, carvedilol, and is off from entresto for congestive heart failure.  He sees Dr. Ramon Castello cardiologist here in jax. The last visit was on March of 20118 [sic] You must get records from him as well.  Was July 11th, 2018.  The pt also claimsd [sic] diifoculty [sic] in walking has bilateral feet pain and diabetes neuropathy.  The pt takes metformin and gabapentin x three times a day.  The pt has a range, normal blood sugar 120 average.

74.   Dr. Anez also stated that "In view of his condition, and multiple medical issues, he has not being [sic] able to work, the last time he work was on may 23er [sic] 2017 due to congestive heart failure."

75.   On October 8, 2018, Dr. Nwaneshiudu produced an addendum to his September 12, 2018 report.  In the addendum, he states that the findings in Dr. Anez's response "were noted in my initial report and no new physical impairments are noted, therefore my initial conclusion remains unchanged."

76.   Dr. Nwaneshiudu failed to consider Plaintiff's condition holistically, including medication side effects.  Courts throughout the country have held that such not considering the claimant's condition holistically is improper.  *See Hertan*, 111 F.Supp.3d at 1086-87 (overturning Unum's denial under a de novo review, holding that Unum had failed to adequately consider how the side effects from plaintiff's prescription pain medications, which rendered her tired, dizzy and unable to focus, affected her cognitive ability to do her job as an attorney); *Godmar*, 631 F.App'x at 405 (holding that it was an abuse of discretion for an insurer to fail to take into consideration the side effects from plaintiff's pain medications and how those side effects impact his ability to drive); *Kirkpatrick*, 856 F.Supp.2d at 998–99

---

[9] Dr. Anez never answered the third question.

Case No.:





1  (granting summary judgment because the administrator failed address the claimant's

2  "physical condition as a whole," and instead focused on each diagnosis

3  individually).  Here, Dr. Nwaneshiudu made no attempt to consider the co-morbid

4  effects of Plaintiff's conditions and medications even though MetLife's own internal

5  records acknowledged the co-morbid effects.

6

7       77.    Dr. Nwaneshiudu produced a poorly reasoned report that consisted of

8  wholly conclusory statements with no analysis and failed to explain why his opinion

9  differed from those of Plaintiff's treating physicians.  Insurers, such as MetLife,

10 should not rely on such flawed opinions in their decision-making process.  *See, e.g.*,

11 *Carrier v. Aetna Life Ins. Co.*, 2015 WL 4511620, at *12–13 (C.D. Cal. July 24,

12 2015) (An insurer's reliance on peer reviewers who present their opinions in a

13 conclusory fashion, making it unclear how they reached opinions that contrasted

14 from those of the insured's attending physicians, is improper, as such conclusions

15 should not be relied upon over the opinions of the insured's attending physicians.).

16 Dr. Nwaneshiudu, despite acknowledging progress notes and treating physicians'

17 contrary opinions, summarily dismissed those opinions without any explanation as

18 to why; he based his opinion solely on a "paper review" of the medical records.  Dr.

19 Nwaneshiudu's failure to properly explain his opinion was improper and reduced

20 the credibility of his opinion.

21

22      78.    Dr. Nwaneshiudu also ignored Plaintiff's subjective complaints and

23 descriptions of his symptoms.  Dr. Nwaneshiudu focused purely on observable

24 phenomena and implicitly required Plaintiff's subjective complaints of pain in his

25 feet to be substantiated by some form of external examination.  Dr. Nwaneshiudu

26 failed to provide any weight to the aspects of Plaintiff's condition that were not

27 specifically quantified with a precise impairment measurement.  He, in essence,

28 applied a standard in which disability means "mechanically unable to perform the

Case No.:

duties." The requirement that Plaintiff's subjective complaints be quantified or otherwise substantiated was in error because it relies on a standard not present in the language of the Plan. Numerous courts throughout the country have ruled that requiring the claimant to meet a standard of evidence not set forth in the relevant plan is improper and compels that the claim decision be overturned. *See Saffle v. Sierra Pacific Power Co.*, 85 F.3d 455, 459–60 (9th Cir. 1996)(Ninth Circuit ruled that requiring a claimant to meet a standard that is not present in the relevant plan's documents "effectively imposes a new requirement for coverage," but because "an administrator lacks discretion to rewrite the Plan," to do so is an abuse of discretion); *Hagerty v. American Airlines Long Term Disability Plan*, 2010 WL 3463620, at *1 (N.D. Cal. Sept. 3, 2010)(Court noted that "[n]umerous courts found it [in] error to require objective medical evidence of complaints that are inherently subjective in nature."); *Cook v. Liberty Life Assur. Co. of Bos.*, 320 F.3d 11, 21 (1st Cir. 2003) (requiring objective documentation of Chronic Fatigue Syndrome is unreasonable). Consequently, Dr. Nwaneshiudu improperly applied a standard and criteria for disability that were not in the Plan, and MetLife should have disregarded his opinion.

79. In a letter dated October 24, 2018, MetLife upheld its denial of Plaintiff's benefits (the "Final Denial"). The Final Denial relied heavily on Dr. Nwaneshiudu's report. MetLife gave no weight to the opinions of Plaintiff's treating physicians — the physicians who actually examined Plaintiff. Once again, MetLife refused to have Plaintiff examined, even though such an examination would have clearly demonstrated that Plaintiff cannot return to work. The Final Denial also stated that Plaintiff's records had been sent to Dr. Nwaneshiudu to be considered holistically, but, as explained above, that never happened. Dr. Nwaneshiudu simply considered each condition in turn without any investigation of the co-morbid effects of those conditions.

Case No.:

80.     The Final Denial contained the same errors as the initial denial of benefits.  Once again, MetLife cherry-picked information by placing absolute emphasis on its paper reviewer over the opinions of Plaintiff's treating physicians.  MetLife, and Dr. Nwaneshiudu, refused to give any credit to Plaintiff's subjective symptoms.  As previously explained, these failures rendered MetLife's denial improper.

81.     Whereas MetLife has abused any discretion the Plan has conferred, MetLife's actions have violated ERISA's claim regulations and these violations were neither inadvertent nor harmless.  As such, under Second Circuit precedent, the proper standard of review is de novo.  *See Halo v. Yale Health Plan*, 819 F.3d 42, 57-58 (2d Cir. 2016).

### FIRST CAUSE OF ACTION

To Recover Benefits, Attorneys' Fees and Pre-Judgment and Post-Judgment Interest
under ERISA Plan – 29 U.S.C. Sections 1132(a)(1)(B), (g)(1)
(Plaintiff against MetLife and DOES 1 through 10)

82.     Plaintiff incorporates the previous paragraphs as though fully set forth herein.

83.     ERISA Section 502(a)(1)(B), 29 U.S.C. Section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to him under the terms of a plan, to enforce his rights under the terms of a plan and/or to clarify his rights to future benefits under the terms of a plan.

84.     At all times relevant, Plaintiff has been entitled to LTD benefits under the Plan.  By denying Plaintiff's claim for LTD benefits under the Plan, and by

-29-



related acts and omissions, MetLife violated, and continues to violate, the terms of the Plan and Plaintiff's rights thereunder.

85.    MetLife has failed to follow even the most rudimentary claims processing requirements of ERISA and of the Department of Labor Regulations and has failed to conduct a "full and fair review" of the claim denial, as required by 29 U.S.C. Section 1133(2).  Thus, even if the Plan vests discretion in MetLife to make benefit determinations, no deference is warranted with regard to MetLife's handling of this claim.

86.    A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29 U.S.C. § 1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the beneficiaries of the Plan.  *See* 29 U.S.C. Section 1104(a)(1).  Under ERISA: (1) a fiduciary must discharge its duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the Plan, on behalf of a party whose interests are adverse to the interests of the Plan, its participants or its beneficiaries.  MetLife's handling of Plaintiff's disability benefit claim falls far short of these standards.

87.    For all the reasons set forth above, the decision to deny LTD disability insurance benefits to Plaintiff was arbitrary, capricious, wrongful, unreasonable, irrational, contrary to the evidence, contrary to the terms of the Plan and contrary to law.  MetLife abused its discretion in deciding to deny this claim, as the evidence shows that its denial decision was arbitrary and capricious.  Further, MetLife's denial decision and actions heighten the level of skepticism with which a court views a conflicted administrator's decision under *Metropolitan Life Insurance Co. v.*



*Glenn*, 544 U.S. 105 (2008).  MetLife's denial of Plaintiff's claim constitutes an abuse of discretion.

88.     As a direct and proximate result of MetLife's denial of disability benefits, Plaintiff has been deprived of LTD benefits from February 26, 2018 to the present.

89.     As a direct and proximate result of the denial of his claim for LTD benefits, Plaintiff has been required to incur attorneys' fees to pursue this action and is entitled to reimbursement of these fees pursuant to 29 U.S.C. Section 1132(g)(1).

90.     A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the Plan and therefore entitled to LTD benefits.  Plaintiff seeks a declaration of this Court that he meets the Plan definition of disability and is entitled to benefits under the Plan.  In the alternative, Plaintiff seeks a remand to the claims administrator for a determination of Plaintiff's claim that is consistent with the terms of the Plan.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court grant the following relief against all Defendants:

1.     For all Plan benefits due and owing Plaintiff, including LTD benefits;
2.     For costs and reasonable attorneys' fees, pursuant to 29 U.S.C. Section 1132(g);
3.     For pre-judgment and post-judgment interest on the principal sum, accruing from the date the obligations were incurred.  *See Blankenship*

Case No.:



1    *v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir.

2    2007) ("A district court may award prejudgment interest on an award of

3    ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*,

4    977 F.2d 246, 253 (6th Cir. 1992); and

5        4.    For such other and further relief as this Court deems just and proper.

6

7    Dated:  October 23, 2019                                MCKENNON LAW GROUP PC

8

9                                                                   By:

ROBERT J. MCKENNON

10                                                                        NICHOLAS A. WEST
Attorneys for Plaintiff Warren Cooper

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



-32-